The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
October 8, 2020

## 2020COA144

## No. 19CA0804, *Suydam v LFI Fort Pierce* — Agency — Respondeat Superior; Civil Procedure — Voluntary Dismissal

A division of the court of appeals analyzes the scope of the

"going-and-coming" rule, which addresses whether an employer

may be held liable for damages caused by the negligence of one of

its employees while the employee is commuting between work and

home or another personal destination.  The division affirms the

district court's denial of a jury instruction on the going-and-coming

rule because the evidence presented at trial did not support the

instruction.  In addition, the division examines novel procedural

issues arising from the voluntary dismissal of a plaintiff's claims

against fewer than all defendants before or during trial under

C.R.C.P. 41(a)(1)(A) and the district court's change in a party's

status from defaulted defendant to nonparty at fault during trial.

The division concludes that the change in the party's status did not prejudice the appealing defendant because the district court instructed the jury that the nonparty was liable to plaintiffs. Lastly, the division concludes that the appellant did not preserve its challenge to the jury's damage award.

COLORADO COURT OF APPEALS     **2020COA144**

Court of Appeals No. 19CA0804
City and County of Denver District Court No. 17CV33350
Honorable Stephen M. Munsinger, Judge

Gary W. Suydam and Lisa Linch-Suydam,

Plaintiffs-Appellees,

v.

LFI Fort Pierce, Inc.,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Navarro and Tow, JJ., concur

Announced October 8, 2020

---

Mann & Maximon, LLC, Stuart Mann, Joshua Maximon, Boulder, Colorado;
Connelly Law, LLC, Sean Connelly, Denver, Colorado, for Plaintiffs-Appellees

Gibson, Dunn & Crutcher LLP, Gregory Kerwin, Julie Hamilton, Denver,
Colorado; Wheeler Trigg O'Donnell LLP, Frederick R. Yarger, Denver, Colorado,
for Defendant-Appellant

¶ 1     Appellee Gary W. Suydam was severely injured when he was struck by two cars while riding his bicycle through an intersection. As a result of the collisions, he was rendered a quadriplegic and requires help with nearly every aspect of daily living. The driver of the first car was Chelsea Brewer, an employee of appellant LFI Fort Pierce, Inc. The driver of the second car was Stephen Tecmire.

¶ 2     Suydam and his wife, Lisa Linch-Suydam, filed a lawsuit against Brewer, LFI, Tecmire, and other defendants not relevant to this appeal. In their complaint, the Suydams alleged that LFI was liable for any damages awardable against Brewer because she was performing job duties for LFI at the time of the accident. The Suydams sought damages in three categories — economic loss, physical impairment or disfigurement, and loss of consortium. They obtained a default against Tecmire after he failed to respond to their complaint.

¶ 3     At the conclusion of a six-day trial, a jury awarded the Suydams more than $54 million in damages, including more than $32 million in damages for physical impairment or disfigurement. The jury determined that Brewer (and thus LFI, as Brewer's

1

employer at the time) was responsible for ninety percent, and Tecmire was responsible for ten percent, of the Suydams' damages.

¶ 4    On appeal, LFI challenges the verdict and the damage award on three grounds.

¶ 5    First, LFI asserts that the trial court erred by failing to give the jury a separate instruction on the "going-and-coming" rule, which addresses when an employer is liable for the actions of an employee who is traveling between work and home or another personal destination. We decide that LFI was not entitled to an instruction on the going-and-coming rule because the scope of work instruction the court gave the jury was supported by the evidence presented at trial, while LFI's proffered instructions were not. The evidence showed that, at the time of the incident, Brewer was engaged in an act or performing a duty under the express or implied direction of LFI. Moreover, Brewer never testified that she was driving home or to another personal destination when her vehicle collided with Gary Suydam.

¶ 6    Second, LFI argues that the trial court erred by changing Tecmire's status from a defaulted defendant to a nonparty on the second day of trial, and that the error is grounds for a new trial.

We disagree because the trial court's determination regarding Tecmire's status did not prejudice LFI.

¶ 7 Third, LFI challenges the jury's damage award on two grounds. LFI contends that the Suydams' counsel impermissibly argued that the jury should calculate damages for physical impairment or disfigurement on a per diem basis. In addition, LFI contends that the damage award must be set aside because Colorado law does not draw a meaningful distinction between those noneconomic damages that are subject to a statutory cap and noneconomic damages for physical impairment or disfigurement, which are not capped. We need not address these arguments, however, because LFI did not preserve them.

¶ 8 For the above reasons, we affirm the judgment.

## I. The Going-and-Coming Rule

¶ 9 LFI contends that the trial court reversibly erred by declining to instruct the jury on the going-and-coming rule, and thereby failed to provide the jury with the applicable legal rule for assessing LFI's principal defense at trial — that Brewer had been driving home and was not working for LFI when she struck Gary Suydam. We are not persuaded.

## A. Standard of Review

¶ 10 A trial court must correctly instruct the jury on all matters of law. *Day v. Johnson,* 255 P.3d 1064, 1067 (Colo. 2011). We review de novo whether "a particular jury instruction correctly states the law" and whether the "instructions as a whole accurately informed the jury of the governing law." *Id.* Because trial courts have broad discretion to fashion the form and style of instructions, we review "for abuse of discretion a trial court's decision not to give a particular jury instruction." *Schuessler v. Wolter,* 2012 COA 86, ¶ 10, 310 P.3d 151, 158; *see Vista Resorts, Inc. v. Goodyear Tire & Rubber Co.,* 117 P.3d 60, 70 (Colo. App. 2004) ("When instructing the jury in a civil case, the trial court shall use those instructions contained in the Colorado Jury Instruction (CJI) that apply to the evidence under the prevailing law. The court's rejection of instructions not contained in CJI is reviewed for abuse of discretion.") (citation omitted). "A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, unfair, or when it misapplies the law." *Nibert v. Geico Cas. Co.,* 2017 COA 23, ¶ 8, ___ P.3d ___, ___.

### B. Legal Authority

#### 1. Nonstandard Jury Instructions

¶ 11    A trial court does not abuse its discretion by rejecting a tendered jury instruction lacking evidentiary support. *Melton v. Larrabee*, 832 P.2d 1069, 1072 (Colo. App. 1992). "A party is entitled to a jury instruction only when it is supported by the evidence . . . .  Further, there must be more than a mere scintilla of evidence to support an instruction." *Id.* (citations omitted); *see Devenyns v. Hartig*, 983 P.2d 63, 70 (Colo. App. 1998) (affirming trial court's refusal to give a jury instruction that lacked evidentiary support).

¶ 12    Moreover, "[t]he trial court may not assume the role of an advocate and bears no responsibility to redraft tendered civil instructions to correct errors in those instructions." *Garhart ex rel. Tinsman v. Columbia/Healthone, L.L.C.*, 95 P.3d 571, 587 (Colo. 2004); *see Hansen v. State Farm Mut. Auto. Ins. Co.*, 957 P.2d 1380, 1384-85 (Colo. 1998) (holding that requiring a trial court to redraft incorrect civil instructions "would be tantamount to interjecting the trial judge into the strategic decision-making of both parties in every trial"); *cf. Short v. Kinkade*, 685 P.2d 210, 211-12 (Colo. App.

1983) (reversing trial court's refusal to modify pattern instruction because the proposed modification "sufficiently informed the trial court of plaintiff's position to trigger the trial court's duty to modify the draft instruction and to instruct the jury correctly on the applicable law").

### 2. The Respondeat Superior Doctrine and the "Going-and-Coming" Rule

¶ 13 Under the doctrine of respondeat superior, an employer is liable for torts committed by its employee while acting within the scope of his or her employment. *Stokes v. Denver Newspaper Agency, LLP*, 159 P.3d 691, 693 (Colo. App. 2006). "The employer is liable if the employee's conduct was motivated by an intent to serve the employer's interests and connected to acts the employee was authorized to perform." *Id.*

¶ 14 Respondeat superior rests on the theory that "the employee acts on behalf of the employer when the employee is within the scope of his or her employment." *Raleigh v. Performance Plumbing & Heating*, 130 P.3d 1011, 1019 (Colo. 2006). Because an "employer has the right to control the employee's performance" within the scope of employment, the employer is held liable for the

employee's acts. *Daly v. Aspen Ctr. for Women's Health, Inc.*, 134 P.3d 450, 452 (Colo. 2005).

¶ 15     "The question of whether an employee [wa]s acting within the scope of the employment is a question of fact . . . ." *Raleigh*, 130 P.3d at 1019.

¶ 16     Respondent superior cases often involve a factual dispute regarding whether the employee was acting within the scope of his or her employment at the time of the act that injured the plaintiff.

¶ 17     The going-and-coming rule informs the scope of the employment relationship in cases where the employee was commuting between work and home or another personal destination at the time of the injury to the plaintiff. *Stokes*, 159 P.3d at 693; *Beeson v. Kelran Constructors, Inc.*, 43 Colo. App. 505, 507, 608 P.2d 369, 371 (1979); *see Pierson v. Helmerich & Payne Int'l Drilling Co.*, 209 Cal. Rptr. 3d 222, 230 (Ct. App. 2016) ("The going and coming rule is used in tort law to determine the scope of employment for purposes of respondeat superior liability.").

¶ 18     The Colorado version of the going-and-coming rule provides that "an employee traveling from . . . work to his home or other personal destination, after completing his day's work, cannot

7

ordinarily be regarded as acting in the scope of his employment so as to charge the employer for the employee's negligence in the operation of the [employee's] car." *Beeson*, 43 Colo. App. at 507, 608 P.2d at 371 (quoting *Balise v. Underwood*, 428 P.2d 573, 577 (Wash. 1967)).

¶ 19    The rule has several exceptions, including when "the employee was engaged in an[] act connected to his work or [was] furthering [the employer's] interests" at the time of the injury-causing conduct. *Stokes*, 159 P.3d at 696; *see also Engler v. Gulf Interstate Eng'g, Inc.*, 258 P.3d 304, 310 n.9 (Ariz. Ct. App. 2011) (holding that the going-and-coming rule does not apply where "the employee's trip was of such character or importance that it would have necessitated a trip by someone else if the employee had not handled it in combination with his otherwise personal journey to or from work"), *aff'd*, 280 P.3d 599 (Ariz. 2012); *Anderson v. Pac. Gas & Elec. Co.*, 17 Cal. Rptr. 2d 534, 536 (Ct. App. 1993) ("Generally, an exception to the going-and-coming rule will be found when the employer derives some incidental benefit from the employee's trip.").

## C. The Evidence Showed that Brewer Was Acting Within the Scope of Her Employment, and Was Not Driving Home or to Another Personal Destination, at the Time Her Vehicle Struck Gary Suydam

### 1. The Testimony Regarding Brewer's Actions on the Day of Gary Suydam's Injury

¶ 20    A significant portion of the trial focused on whether Brewer was acting within the scope of her employment with LFI when her vehicle struck Gary Suydam.  LFI is a temporary employment company that provides workers for LFI's customers.  The parties agreed that, at the time of the accident, Brewer was driving from the job site of an LFI customer to one of LFI's offices.

¶ 21    The undisputed evidence showed that, at that time, Brewer was transporting two other LFI employees, LFI equipment, and a work order documenting the number of hours the three LFI employees had worked that day and containing information about the customer.  Most significantly, the work order included the customer's personnel requirements for the following day.  Brewer testified as follows:

- On the date of the incident, she arrived at LFI's office and waited for a job assignment.  Initially, she told LFI that she did not have a vehicle, but after waiting for work for

9

approximately three hours while other employees with vehicles received assignments, she informed LFI that she had a vehicle. LFI promptly gave her an assignment. (LFI maintained separate lists for employees with and without access to a vehicle.)

- As part of the assignment, she was to drive herself and two other LFI employees to and from the job site.

- One of the other employees left an identification card at LFI's office as collateral for the equipment he borrowed from LFI for the day.

- Before she concluded her work for the day, she was required to return LFI's equipment and the completed work order to LFI's office.

- LFI provided Brewer with directions from its office to the job site. She was following those directions in the reverse direction when her vehicle struck Gary Suydam.

- After the collision, she drove to LFI's office to return the equipment and pick up her paycheck.

¶ 22    During the defense case, LFI representatives testified that

10

- LFI does not favor employees with vehicles when distributing job assignments and does not require employees with vehicles to drive other employees without vehicles to a job site.

- LFI's written transportation policy, which Brewer signed, stated that employees shall "provide transportation from [LFI] to the customer's premises or job site," which LFI's witnesses interpreted to mean that it "is entirely up to the employees" how they get to and from a job site.

- LFI does not control the route employees take while commuting, reimburse them for mileage or the cost of public transportation while commuting, or encourage them to carpool.

- LFI pays its employees only for the time they are working at a job site, and not for the time they spend traveling to or from the site.

- LFI does not require its employees to return to its office after they finish working for the day, even if the employees are in possession of a completed work order or LFI equipment.

- LFI's employees can pick up their paychecks at any time.

- The job site at which Brewer and the other employees had worked that day was approximately one mile from LFI's office.

- LFI's office is near a major bus line and a light rail station.

- Brewer's possession of a vehicle was irrelevant to the job assignment.

¶ 23   LFI's counsel did not ask Brewer about her next destination after she stopped at LFI's office following the incident. No evidence at trial showed that Brewer was heading home or to another personal destination at the time her vehicle struck Gary Suydam.

### 2. LFI's Proposed Instructions on the Going-and-Coming Rule

¶ 24   Following the close of evidence, LFI tendered two proposed jury instructions on the going-and-coming rule. LFI's first tendered instruction addressed an exception to the going-and-coming rule:

> An employee who has finished her duties and is driving home from work at the time of the collision is engaged in an act furthering her employer's interests when the benefit to her employer is of such character or importance that it would have necessitated a trip by someone else if the employee had not been

able to do it in combination with traveling home from work.

¶ 25   LFI's second tendered instruction read,

> An employee is not within the scope and course of employment when she has finished with her duties and is driving home from work at the time of the collision unless at the time of the collision she is also engaged in an act furthering her employer's interests.

As these quotes indicate, both of LFI's proposed instructions referred to "driving home from work."

¶ 26   After the Suydams' counsel objected that LFI's proposed instructions did not fit the evidence because Brewer was not driving home at the time of the accident, the trial court summarily rejected LFI's tendered instructions.  Instead, the trial court gave an instruction based on the standard scope of work instruction. CJI-Civ. 8:9 (2020) (stock instruction on "Scope of Authority of Agent").  The court's scope of work instruction stated that

> Chelsea Brewer was acting within the scope of her employment with [LFI] when Chelsea Brewer was doing work that was:
>
> 1.   Assigned by [LFI]; or
>
> 2.   Proper, usual, and necessary to accomplish the assigned work; or

13

3.     Customary in the particular trade or
business to accomplish the assigned work.

¶ 27     The court also gave an instruction on the parties' claims and

defenses.  That instruction stated, in part, that

> LFI Fort Pierce denies that Chelsea Brewer was
> acting within the course and scope of her
> employment at the time of the accident.
>
> . . . .
>
> You are to determine whether Chelsea Brewer
> was acting in the course and scope of her
> employment with LFI Fort Pierce at the time of
> the accident.

¶ 28     The jury expressly found that Brewer was acting within the

scope of her employment with LFI at the time her vehicle struck

Gary Suydam.

> D.     The Trial Court Did Not Abuse Its Discretion by Declining to
> Instruct the Jury on the Going-and-Coming Rule

¶ 29     The trial court did not abuse its discretion by rejecting LFI's

tendered going-and-coming instructions for two reasons.  First, the

evidence introduced at trial showed that Brewer was not driving

home or to another personal destination at the time her vehicle

struck Gary Suydam and thus did not support LFI's proposed

instructions.  Second, the scope of work instruction that the trial

court gave the jury accurately stated the law applicable to the issue

14

of whether Brewer had been acting within the scope of her employment at the time of the collision.

### 1. The Evidence at Trial Did Not Support LFI's Proposed Jury Instructions

¶ 30    LFI's proposed jury instructions referred to "[a]n employee [who] . . . has finished with her duties [and] is driving home from work at the time of the collision . . . ." But the evidence showed that Brewer was not driving home (or to another personal destination) at the time of the collision. Rather, as noted above, she was returning to LFI's office from a job site to which LFI had assigned her with two other LFI employees, LFI equipment, and a work order. The work order contained the customer's personnel requirements for the following day, which informed LFI how many employees to send to the customer's job site the next day. Obtaining the work order thus provided a more than incidental benefit to LFI.

¶ 31    The trial court acted within its discretion by rejecting LFI's proposed jury instructions because they assumed facts not in the record evidence. *See Devenyns*, 983 P.2d at 70; *Melton*, 832 P.2d at 1072. LFI could not draft a going-and-coming instruction that

15

conformed to the facts because, as noted above, that rule applies only when an employee is "traveling from . . . work to his home or other personal destination, after completing his day's work." *Beeson*, 43 Colo. App. at 507, 608 P.2d at 371 (quoting *Balise*, 428 P.2d at 577).

¶ 32 The going-and-coming rule, by definition, could not apply here because no evidence showed that Brewer was driving home or to another personal destination at the time her vehicle struck Gary Suydam. And the trial court had no duty to rewrite LFI's tendered jury instructions, even if they could have been salvaged through editing. *See Garhart*, 95 P.3d at 587.

### 2. The Court's Scope of Work Instruction Accurately Stated the Law and Applied to the Evidence

¶ 33 The trial court's instruction on scope of work accurately stated the law and was supported by the evidence introduced at trial. The instruction properly instructed the jury on the law governing scope of work and "as a whole accurately informed the jury of the governing law." *Day*, 255 P.3d at 1067.

¶ 34 And, as explained above, the evidence showed that LFI derived a benefit from Brewer's use of her vehicle at the time of the

16

incident, including Brewer's delivery of the work order advising LFI how many employees the customer needed the next day. *See Stokes*, 159 P.3d at 693 ("The employer is liable if the employee's conduct was motivated by an intent to serve the employer's interests and connected to acts the employee was authorized to perform.").

¶ 35 For these reasons, we hold that the trial court did not abuse its discretion by rejecting LFI's tendered instructions on the going-and-coming rule.

## II. The Change in Tecmire's Status from Defaulted Defendant to Nonparty at Fault

¶ 36 LFI argues that the trial court reversibly erred when, on the second day of trial, it changed Tecmire's status from a defaulted defendant to a nonparty at fault (the Tecmire ruling). LFI asserts that the Tecmire ruling unfairly prejudiced LFI, and requires a new trial, because the ruling improperly (1) shifted the burden of proving Tecmire's liability from the Suydams to LFI; (2) gave the Suydams the opportunity "to excuse Tecmire for his negligence through expert opinion and argument"; and (3) enabled the Suydams'

counsel "to make prejudicial arguments in closing urging the jury to maximize the share of damages apportioned vicariously to LFI."

¶ 37 We disagree that the trial court erred because, at the beginning of trial, the trial court instructed the jury that Tecmire was liable to the Suydams and a cause of their damages. In light of this instruction, the Tecmire ruling did not prejudice LFI.

## A. Standard of Review

¶ 38 We review de novo a trial court's determination of whether a person is a defendant or a nonparty. *See Pedge v. RM Holdings, Inc.*, 75 P.3d 1126, 1128 (Colo. App. 2002) (holding that appellate courts review de novo whether a defendant was properly designated a nonparty at fault).

## B. Legal Authority

### 1. Designation of a Nonparty at Fault

¶ 39 In Colorado, defendants in negligence actions are generally liable only for their own percentage share of the damages awardable to the plaintiff. *Stone v. Satriana*, 41 P.3d 705, 708-09 (Colo. 2002).

¶ 40 Colorado abolished the concept of joint and several liability in tort cases. Under that concept, each defendant, regardless of fault, could be held liable for the entire amount of the plaintiff's damages.

18

*Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 286 (Colo. 2000). In place of the doctrine of joint and several liability, the General Assembly adopted section 13-21-111.5(1), C.R.S. 2019, which provides that

> [i]n an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage, or loss . . . .

*See Union Pac. R.R. Co. v. Martin*, 209 P.3d 185, 187-88 (Colo. 2009). (The doctrine of joint liability survives in conspiracy cases. Defendants who "consciously conspire and deliberately pursue a common plan or design to commit a tortious act" may still be held jointly liable. § 13-21-111.5(4). But joint liability is not an issue in this case because the Suydams did not allege a conspiracy.)

¶ 41    Under section 13-21-111.5(3), a jury may consider the percentage fault of a nonparty in determining the percentage fault of a defendant. In negligence cases involving multiple defendants, "each of [the] several wrongdoers is liable for only a portion of a plaintiff's injuries, calculated according to that wrongdoer's percentage of fault," even if one or more of the wrongdoers is not a

19

party.  *Moody v. A.G. Edwards & Sons, Inc.*, 847 P.2d 215, 217 (Colo. App. 1992); *see Martin*, 209 P.3d at 187-88.

¶ 42     If the plaintiff chooses not to join a potentially liable wrongdoer as a defendant, section 13-21-111.5(3)(b) allows a defendant to designate the wrongdoer as a nonparty at fault for the purpose of apportioning liability.  *See Thompson v. Colo. & E. R.R. Co.*, 852 P.2d 1328, 1329 (Colo. App. 1993).  A defendant has a financial incentive to minimize its own percentage of negligence or fault by informing the jury of all persons who are potentially liable for the plaintiff's damages.

¶ 43     To designate a nonparty, a defendant must file a notice identifying the nonparty and providing a brief statement of the basis for believing the nonparty is at fault.  *Id.*; *see* § 13-21-111.5(3)(b). The notice must be filed "within ninety days following commencement of the action unless the court determines that a longer period is necessary." § 13-21-111.5(3)(b).  "The designation requirement has been strictly construed." *Thompson*, 852 P.2d at 1329.

¶ 44     An argument that a nonparty is at fault is an affirmative defense because it allows the defendant to reduce its liability by

"proving that the blameworthy conduct of other parties or nonparties also caused the injury." Ronald M. Sandgrund & Jennifer A. Seidman, *Deconstructing Construction Defect Fault Allocation and Damages Apportionment—Part I,* 40 Colo. Law. 37, 40-41 (Nov. 2011); *Ochoa v. Vered,* 212 P.3d 963, 972 (Colo. App. 2009).

¶ 45 Where a defendant has designated one or more nonparties at fault, the "finder of fact is required to return a special verdict . . . determining the percentage of negligence or fault attributable to each of the parties" and any properly designated nonparties. *Thompson,* 852 P.2d at 1329; *see* § 13-21-111.5(2).

## 2. Entry of Default

¶ 46 When "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . ., the clerk shall enter his default." C.R.C.P. 55(a). "[A]n entry of default establishes a party's liability [and] [t]he allegations in the plaintiff's complaint [concerning the defaulting party] are also deemed admitted." *Dickinson v. Lincoln Bldg. Corp.,* 2015 COA 170M, ¶ 22, 378 P.3d 797, 804 (citations omitted). An entry of default, however, is not "an admission regarding damages." *Id.* at ¶ 23, 378 P.3d at 804.

And an entry of default is not a default judgment, which a party can obtain by following the procedures described in C.R.C.P. 55(b) and C.R.C.P. 121, section 1-14.

¶ 47 A court may set aside an entry of default for "good cause." C.R.C.P. 55(c).

### 3. Dismissal of Defendants by Notice

¶ 48 "[A] plaintiff is the master of his complaint," *Gadeco, LLC v. Grynberg*, 2018 CO 22, ¶ 17, 415 P.3d 323, 329, and has the option to name as defendants any or all potentially liable parties, *see, e.g.*, C.R.C.P. 20(a). A plaintiff may also dismiss "an action . . . without order of court . . . [b]y filing a notice of dismissal at any time before filing or service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs." C.R.C.P. 41(a)(1)(A). If Rule 41(a)(1)(A) does not apply, and the parties do not stipulate to dismissal of the defendant, a plaintiff must obtain a court order under Rule 41(a)(2) to dismiss the action.

¶ 49 Because Rule 41(a)(1)(A) refers to dismissal of "an action," it is unclear whether a plaintiff may dismiss by notice fewer than all the defendants in a case. Prior Colorado cases do not address whether a plaintiff may dismiss claims against certain, but not all,

defendants in an action through a Rule 41(a)(1)(A) notice. The federal circuits have split on this issue when interpreting the analogous federal rule. *Compare Harvey Aluminum, Inc. v. Am. Cyanamid Co.*, 203 F.2d 105, 108 (2d Cir. 1953) ("Rule 41(a)[(1)] provides for the voluntary dismissal of an 'action' not a 'claim'; the wor[d] 'action' as used in the Rules denotes the entire controversy, whereas 'claim' refers to what has traditionally been termed 'cause of action.'"), *and Philip Carey Mfg. Co. v. Taylor*, 286 F.2d 782, 785 (6th Cir. 1961) (following the reasoning of *Harvey Aluminum*), *with Marex Titanic, Inc. v. Wrecked & Abandoned Vessel*, 2 F.3d 544, 547 (4th Cir. 1993) ("[W]e reject the *Harvey Aluminum* exception to the plain meaning of Rule 41(a)(1)(i)'s text."), *and Plains Growers v. Ickes-Braun Glasshouses, Inc.*, 474 F.2d 250, 255 (5th Cir. 1973) (stating that the cases rejecting *Harvey Aluminum*'s interpretation of Fed. R. Civ. P. 41 took the "better view" and holding that a party may dismiss by notice "such of the defendants as have not served an answer or motion for summary judgment, despite the fact that the case might remain pending against other defendants"). *See Grear v. Mulvihill*, 207 P.3d 918, 922 (Colo. App. 2009) (holding that cases interpreting a Federal Rule of Civil Procedure that is

23

analogous to a Colorado Rule of Civil Procedure are persuasive authority).

### C. The Suydams' Efforts to Change Tecmire's Status from a Defaulted Defendant to a Nonparty

¶ 50 Although the procedural history of the Suydams' efforts to change Tecmire's status from that of defaulted defendant to nonparty is convoluted, a summary of that history is necessary to understand why LFI contends that the change in Tecmire's status resulted in prejudice to LFI and is grounds for a new trial.

¶ 51 In the months leading up to, and during, the trial, the Suydams took several steps, detailed below, to dismiss Tecmire as a defendant. Recall that, early in the case, the Suydams obtained an entry of default against Tecmire pursuant to C.R.C.P. 55(a) after he failed to respond to their complaint.

¶ 52 The sequence of events began with the Suydams' designation of Anne Stodola as an expert witness on engineering, mechanical engineering, and accident reconstruction. LFI moved to exclude Stodola's opinion testimony that Tecmire "had insufficient time to avoid the collision," which, LFI argued, would establish that Tecmire was not negligent. LFI asserted that this opinion testimony

24

was inconsistent with the legal effect of the entry of default against Tecmire — that he was liable to the Suydams — and improperly raised a defense on behalf of Tecmire. The court granted the motion.

¶ 53    Four days later, the Suydams filed a motion to dismiss Tecmire as a defendant under C.R.C.P. 41(a)(2), which, as explained above, allows for dismissal of actions by court order. LFI opposed the motion. LFI argued that, if the court dismissed Tecmire as a party, the court should "impose as a reasonable term and condition of dismissal the continued effect of the entry of default . . . as law of the case." This meant the court should rule that Tecmire was liable to the Suydams even though he was no longer a defaulted defendant. *See Dickinson,* ¶ 22, 378 P.3d at 804.

¶ 54    After LFI filed its opposition to the Suydams' motion for dismissal of their claims against Tecmire, the Suydams withdrew the motion. In its place, the Suydams filed a notice to dismiss Tecmire as a party pursuant to Rule 41(a)(1)(A). As explained above, this type of notice effectuates the dismissal of actions (and possibly individual claims) without the need for a court order.

¶ 55     The next relevant step occurred when the Suydams moved for reconsideration of the court's order excluding Stodola's expert testimony.  The court reversed itself and granted the motion, ruling that Stodola's testimony was of "central importance to the disputed claims and affirmative defenses in this action."  Despite the Suydams' filing of the Rule 41(a)(1)(A) notice, in granting the Suydams' motion for reconsideration, the court referred to Tecmire as a defendant and stated that it "would be improper for an expert to misrepresent . . . Tecmire's defaulted status pursuant to C.R.C.P. 55(a) to the jury . . . ."  The court concluded that any potential prejudice resulting from Stodola's testimony could be "effectively resolved through appropriate jury instructions."

¶ 56     On the first day of trial, counsel for the Suydams and counsel for Brewer and LFI presented arguments on the admissibility of Tecmire's alleged statement to a police officer that Gary Suydam had run into Brewer.  The admissibility of the statement, which LFI's counsel said contradicted Stodola's opinion that Tecmire had no time to stop before colliding with Gary Suydam, rested on whether Tecmire was still a defendant.  LFI's counsel asserted that Tecmire remained a defendant and, therefore, Tecmire's out-of-

26

court statement was an admissible admission by a party-opponent. Counsel for the Suydams disagreed, asserting that the statement was inadmissible hearsay because they had dismissed Tecmire from the case. (The admissibility of the statement is not an issue in this appeal.)

¶ 57 The court said that Tecmire remained a party because he had not been dismissed from the case. Later that day, counsel for the Suydams asked the court to rule that Tecmire was no longer a defendant. The court took the matter under advisement and the trial proceeded.

¶ 58 One of the court's first statements to the jury addressed Tecmire's fault. The court read the jury this instruction before the lawyers made their opening statements:

> The Court has determined as a matter of law that [Brewer] and [Tecmire] are at fault and a cause of the injuries and the losses claimed by the [Suydams]. Because the Court has determined these issues as a matter of law, you must accept them as true. The only issue to remain for the jury to determine as to [Brewer]'s fault and [Tecmire]'s fault is the nature and extent of injuries and amount of damages caused by [Brewer's and Tecmire's] fault, if any.

¶ 59    In his opening statement, LFI's counsel reminded the jury that the court had already determined that Tecmire was at fault for the Suydams' injuries and that the jury's task was to apportion damages between Brewer (and, thus, LFI) and Tecmire.

¶ 60    The following day, the court issued the Tecmire ruling, stating,

> I believe it's necessary for this jury to be able to make a determination of relevant fault between [Brewer and Tecmire]. [They] were both . . . causes — or contributors of causing the injuries to the plaintiff. . . . It's up to the jury to determine the relevant fault of each of those individuals. . . . As I understand, at [the Suydams'] request, I have to treat him as a nonparty. So that will be my order as to that.

¶ 61    As of the Tecmire ruling, if not when the Suydams filed their Rule 41(a)(1)(A) notice, Tecmire was a nonparty and no longer a defaulted defendant. After making the Tecmire ruling, the court did not rescind or modify the instruction it had given the jury the previous day regarding Tecmire's liability and role in causing the Suydams' damages. By instructing the jury that Tecmire, now a nonparty, was liable to the Suydams, the court, in effect, designated Tecmire as a nonparty at fault after the deadline for designating nonparties at fault had passed.

¶ 62    Later in the trial, Stodola opined that Tecmire "did not have time to stop at all [before colliding with Suydam]. He didn't even have time to stop and react to it." She testified that Brewer, and not Tecmire, was at fault for the collision. On cross-examination, however, she acknowledged that the trial court had determined that Tecmire was negligent, and thus at fault, for the accident.

¶ 63    During closing argument, the Suydams' counsel minimized Tecmire's role in the accident by asserting that Brewer had placed Tecmire in an "emergency situation that did not give him adequate time to avoid [Suydam]." Counsel for the Suydams told the jury that "the percentage you assign to Chelsea Brewer is the percentage for which LFI is responsible. Any portion that you assign to Mr. Tecmire, LFI is not responsible for."

¶ 64    LFI's counsel reminded the jury in his closing argument that the trial court "ha[d] already determined that Mr. Tecmire was negligent or at fault" and specifically referenced the jury instruction the court had given on the first day of trial. LFI's counsel asked the jury to apportion the majority of the Suydams' damages to Tecmire, arguing that his collision with Gary Suydam, and not his collision with Brewer, had caused Gary Suydam's injuries.

29

¶ 65    In its special verdict form, the jury first found that Brewer was acting within the scope of her employment with LFI at the time her vehicle struck Gary Suydam and, second, found that LFI was liable for Brewer's negligence.  The jury apportioned ninety percent fault to Brewer (and by extension LFI) and ten percent fault to Tecmire.

### D.    Even if the Trial Court Erred by Changing Tecmire's Status from a Defaulted Defendant to a Nonparty at Fault, the Error Did Not Prejudice LFI

#### 1.    The Tecmire Ruling Did Not Shift the Burden of Proving Tecmire's Liability from the Suydams to LFI

¶ 66    LFI argues that the Tecmire ruling improperly shifted its burden of proof in the middle of the trial.  LFI contends that, because the designation of a nonparty at fault operates as an affirmative defense, once Tecmire became a nonparty at fault, rather than a defaulted defendant, LFI bore the burden of proving Tecmire's liability.  *See* § 13-21-111.5(1).  For this reason, LFI argues that the Tecmire ruling "reversed the burden of proof on Tecmire's liability" and forced LFI to "to prove Tecmire's negligence and liability, facts the parties had assumed as established for more than a year."  *See Rains v. Barber*, 2018 CO 61, ¶ 14, 420 P.3d 969, 973 (explaining that shifting a party's burden of proof can

constitute an "irregularity warranting a new trial" under C.R.C.P. 59(d)(1)).

¶ 67     At no time during the trial, however, did LFI bear the burden of proving Tecmire's "negligence and liability" because the trial court instructed the jury on the first day of trial that Tecmire was liable to the Suydams and a cause of their damages. Thus, from the beginning of the trial, the jury knew that the court had determined Tecmire's liability and that its role as to Tecmire was limited to deciding his percentage of liability for the Suydams' damages. For this reason, LFI was not required to prove Tecmire's liability on the first day of trial, when the court treated Tecmire as a defaulted defendant, or on the last day of trial, when the court treated Tecmire as a nonparty at fault.

¶ 68     LFI's counsel echoed the trial court's initial instructions in his opening statement. He reminded the jury that the court had determined that Tecmire was "at fault for causing [the] accident, and that his fault was a cause of and contributed to Mr. Suydam's injuries, life care needs, loss of income, all of the impairment, all of that." He told the jury that, because Tecmire's negligence had been established and there was no dispute he was a cause of the

31

Suydams' injuries, the jury's task was limited to "apportion[ing] damages, meaning you determine what injuries were caused by the first impact when [Suydam] ran into the side of Ms. Brewer's car, and which injuries . . . were the result of Mr. Tecmire[] . . . ."

¶ 69 Similarly, in his closing argument, LFI's counsel told the jury that the court "has determined as a matter of law that defendant Chelsea Brewer and nonparty Stephen Tecmire are at fault and that their fault was a cause of the injuries, damages, and losses claimed by plaintiffs Gary Suydam and Lisa Linch-Suydam." A comparison of LFI's opening statement and closing argument demonstrates that the Tecmire ruling did not place any additional burdens on LFI.

¶ 70 Further, the Tecmire ruling alone did not require LFI to prove Tecmire's percentage of liability to the Suydams. At the time Tecmire was a defaulting defendant, LFI had a significant financial incentive to argue that Tecmire — and not Brewer, its employee — was liable for the vast majority of the Suydams' damages. And LFI surely recognized that the Suydams would argue the opposite point — that LFI, the only corporate defendant, should be held liable for the vast majority of the Suydams' damages. Thus, at all times during the trial, LFI had a significant financial incentive to argue to

32

the jury that Tecmire was liable for the vast majority of the Suydams' damages.

¶ 71    Because the court instructed the jury at the beginning and the end of the trial that Tecmire was negligent and a cause of the Suydams' injuries — points that LFI's counsel echoed in his opening statement and closing argument — we disagree with LFI that the Tecmire ruling prejudiced LFI and is therefore grounds for a new trial.

¶ 72    For these reasons, we conclude that, even if the court erred by dismissing the Suydams' claims against Tecmire on the second day of trial, the error was harmless because it did not result in unfair prejudice to LFI.  *See Clark v. Buhring*, 761 P.2d 266, 268 (Colo. App. 1988).

2.    The Tecmire Ruling Did Not Excuse Tecmire for His Negligence

¶ 73    LFI additionally argues that, as a consequence of the Tecmire ruling, Stodola was able to "opin[e] that Tecmire could not have avoided the collision and was blameless for it."

¶ 74    As explained above, Stodola's testimony was the subject of two pretrial motions.  Shortly before trial, the trial court ruled that Stodola could present her opinions at trial.  In its ruling, the court

noted that Stodola's testimony was of "central importance to the disputed claims and affirmative defenses," including the defendants' respective liability to the Suydams.

¶ 75    LFI does not appear to challenge this ruling.  But even if LFI argues that the trial court erred by deciding before trial that Stodola's opinion testimony was admissible, the court made clear in its ruling that it would not permit Stodola to misrepresent Tecmire's default.  The court said that any potential prejudice to LFI resulting from Stodola's testimony could be "effectively resolved through appropriate jury instructions."

¶ 76    The court's statements proved accurate.  First, Stodola acknowledged on cross-examination that the court had previously determined that Tecmire was at fault for the accident.  Second, the court instructed the jurors that Tecmire was liable for, and a cause of, the Suydams' injuries.

¶ 77    For these reasons, Stodola's testimony did not prejudice LFI, regardless of whether Stodola was able to present her opinions only because of the Tecmire ruling.

### 3. The Tecmire Ruling Did Not Allow the Suydams' Counsel to Make Prejudicial Arguments in His Closing

¶ 78    LFI contends that, by virtue of the Tecmire ruling, counsel for the Suydams was able to make prejudicial assertions about LFI's liability in his closing argument.

¶ 79    Specifically, LFI argues that the Tecmire ruling allowed the Suydams' counsel to violate section 13-21-111.5(5), which states that "the jury shall not be informed as to the effect of its finding as to the allocation of fault among two or more defendants." LFI contends that the court's classification of Tecmire as a nonparty on the second day of trial improperly opened the door to the Suydams' counsel's argument in closing that the jury should award the bulk of damages against LFI. It asserts that, but for the Tecmire ruling, the Suydams' counsel could not have argued that "[a]ny portion that you assign to Mr. Tecmire, LFI is not responsible for. So it is only the percentage of fault of Chelsea Brewer for which LFI is responsible."

¶ 80    But even if the Tecmire ruling permitted counsel for the Suydams to violate section 13-21-111.5(5) in his closing argument, LFI's counsel did not contemporaneously object when, in closing,

the Suydams' attorney commented on Tecmire's and LFI's share of the Suydams' damages. "If a party fails to make a contemporaneous objection to closing argument, objection to its propriety is waived." *Salazar v. Am. Sterilizer Co.*, 5 P.3d 357, 368 (Colo. App. 2000). LFI cannot attack the Tecmire ruling based on a statement in the Suydams' closing argument to which its attorney did not object.

4. We Need Not Decide Whether the Rule 41(a)(1)(A) Notice or the Tecmire Ruling Changed Tecmire's Status from a Defaulted Defendant to a Nonparty

¶ 81 Because we hold that the court's jury instruction on Tecmire's liability avoided any prejudice to LFI resulting from the Tecmire ruling, we need not determine whether the Suydams' Rule 41(a)(1)(A) notice or the Tecmire ruling effected the change in Tecmire's status. Regardless of the date on which the Suydams' claims against Tecmire were dismissed, the court instructed the jury from the inception of the trial that Tecmire was liable for, and a cause of, the Suydams' damages.

¶ 82 For these reasons, we hold that the Tecmire ruling did not prejudice LFI and, thus, was not an "irregularity in the proceedings" that entitled LFI to a new trial. *See* C.R.C.P. 59(d)(1).

36

III. LFI Did Not Preserve Its Challenge to the Jury's Award of Damages for Physical Impairment and Disfigurement

¶ 83    LFI challenges the jury's award of more than $32 million to Suydam for "physical impairment or disfigurement" because (1) it allegedly rests on an improper per diem argument and (2) Colorado's legal framework for physical impairment damages is unconstitutionally vague.  We do not consider these arguments because LFI failed to preserve them.

A.    The Suydams' Per Diem Argument

¶ 84    LFI contends that the damages award was improper because the jury relied "solely on an arbitrary 'per diem' argument" and, therefore, the award was "unsupported by the evidence."

¶ 85    In closing argument, the Suydams' counsel asserted that Gary Suydam should receive more than $32 million in damages as compensation for his physical impairment or disfigurement. Counsel noted that the experts who had testified made "somewhere around $350 an hour to work on this case."  He then stated,

> So let's say we were to say, [Suydam], at $200 an hour, and we'll say 16 hours a day.  We know that he has spasms in the middle of the night and that he can't control them, but we'll just say 16 hours, not 24 hours.  And there are 365 days in a year.  And there is a life

expectancy in the instruction that you received of 27.2 years. And I've already done the math to multiply these: $31,769,600 for impairment. . . . That is a fair and just amount in this case.

¶ 86 LFI's counsel did not contemporaneously object to this argument, however. For this reason, LFI did not preserve its challenge to the Suydams' per diem damages argument. *See Salazar*, 5 P.3d at 368.

> B. The Colorado Statute Authorizing Awards for Physical Impairment or Disfigurement

¶ 87 LFI asserts that, under Colorado law, there is no meaningful distinction between damages for "nonpecuniary harm . . . including pain and suffering, inconvenience, emotional stress, and impairment of the quality of life," which are subject to a cap, *see* § 13-21-102.5(2)(b), C.R.S. 2019, and damages for physical impairment or disfigurement, which are not capped, *see* § 13-21-102.5(5). Thus, LFI argues, juries and judges are forced "to speculate whether damages should be assigned to 'impairment of the quality of life,' on the one hand, or 'physical impairment' on the other." LFI asserts that this lack of clear standards allows plaintiffs to "avoid statutory caps on noneconomic damages through a

'labeling exercise'" to categorize damages for impairment of quality of life as damages for physical impairment.

¶ 88    But, at trial, LFI did not challenge the award of damages for physical impairment or disfigurement damages to Gary Suydam. LFI's counsel even acknowledged that such damages were appropriate given Gary Suydam's serious injuries.

¶ 89    During the jury instruction conference, LFI's counsel did not object to instructing the jury on damages for physical impairment or disfigurement.  LFI's counsel's objection to the Suydams' proposed instruction on such damages narrowly focused on the tone of the instruction, which LFI's counsel argued read "like a closing argument."

¶ 90    Notably, during the instruction conference, LFI's counsel said, "[i]f you say permanent impairment is, and define it, we would be amenable to that."  Counsel for LFI further asserted that, "in this particular case, with Gary Suydam, it is so obvious that I don't think [a definitional instruction is] necessary."  Moreover, LFI's counsel did not object or otherwise respond when the judge said, "I don't think there is any dispute about damages."  And later during the instruction conference, LFI's counsel advised the court that LFI

had no objections regarding the instructions or verdict forms, except as to the court's rejection of LFI's proposed instructions on the going-and-coming rule.

¶ 91 The instructions and verdict forms broke down Gary Suydam's damages into only two categories — damages for economic loss and damages for physical impairment or disfigurement. LFI's counsel did not tender a proposed instruction or verdict form that would have allowed the jury to award the type of noneconomic damages that are subject to the statutory cap, rather than damages for physical impairment or disfigurement.

¶ 92 In light of this record, LFI failed to preserve its argument that there is no meaningful distinction between the noneconomic damages subject to the cap and damages for physical impairment or disfigurement. "C.R.C.P. 51 requires parties to object to alleged errors in instructions before they are given to the jury. 'Only the grounds so specified shall be considered . . . on appeal.' Alleged errors that are not objected to are waived." *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1195 (Colo. App. 2009) (quoting C.R.C.P. 51).

¶ 93     For these reasons, we do not reach the merits of LFI's arguments regarding the damage award to the Suydams.

## IV.    Conclusion

¶ 94     The trial court's judgment is affirmed.

JUDGE NAVARRO and JUDGE TOW concur.